Case number 193533 Health and Wellness Lifestyle v. Raintree Golf, LLC, et al. v. Raintree Golf, LLC, et al. Stavnicki for the appellant. You may proceed. Morning, Your Honor. My name is Mike Stavnicki. I represent the Plaintiff Appellant Health and Wellness. I'd like to reserve three minutes for rebuttal, and I did work that out with the bailiff beforehand. I believe in right and wrong. I believe in just and unjust. I believe in fair and unfair. And what happened to health and wellness at the hands of Judge Adams in this case was not fair, was not just. There's a reason probably with those beliefs that I became, it's probably why I became a lawyer. And there's a reason that the justice system and the court system upholds those ideals. And the symbol for that is Lady Justice. We've all seen that statue where Lady Justice is blindfolded, holding the scales in one hand with a sword and a scroll in the other. The scales represent fairness. The blindfold represents equality and impartiality. The sword represents protection. And the scroll represents knowledge. Judge Adams failed at all of those canons in its dealings with health and wellness. Health and wellness was not protected. You know, when I read your version of the sequence of events, you do manage to cast what happened in the district court in a light that might tend to support your claims. But it's not exactly what happened here. I mean, you all had been trying to settle the case, right? And you'd engaged in an informal exchange of information, whether it was pursuant to Rule 26 or just because you were trying to settle the case, right? Correct. And then, at some point, Judge Adams said, well, look, it's time to move on. And he wanted the defendant to file a motion for summary judgment, which happened. And then the request for a scheduling order came not at the beginning of the whole case, but it came at some point when you were getting geared up on the summary judgment motion, correct? Correct. And while it might be accurate to say that the parties didn't engage in formal discovery, it's not accurate to say that the parties didn't exchange a good deal of information, is it? I don't think that what you're saying is accurate. And it predates me, so I'm a little bit in the dark. I was replacement counsel. I came in on right after they'd filed for summary judgment. I came in in early July, so I was not involved in the winter and spring of 2018. Here's my understanding of how it went down based upon speaking. What were you unable to obtain that would have been helpful to your – what had you not obtained that would have been helpful in the consideration of the summary judgment motion? That's two parts, and let me try to address your question and then deal with the second part. The issue that had come up was this financial distress with this business. And the information that I tried to obtain once I got involved, but it's all post-summary judgment, was what was happening with its lender. There's applications that are filed with the lender. There was information that was in the summary judgment with a declaration from a tax attorney who had worked on the matter for my clients, Mr. Garrison, saying – Are you talking about your client's lender? No, their lender. That's what I thought you were talking about. Correct. Which is, if you're a business and you're – So your complaint with your adversary is the lack of – is Rain Tree's lack of financial stability, correct? Correct. But you couldn't obtain your financing either, right? That's – it's – and I see where you're going with it, and it's an interesting point. So let me kind of come back and I'm going to – Is it correct? Is what I just said wrong? Well, they could have self-financed. You're right. They never had, at the end, a final approved commitment from a lender. They had commitments from a lender in the midst of it, but commitments, if you work in private practice, commitments from a lender are good for like a period of time. So it will be good for 60 days or open for 90 days, and then you've got to reapply and re-go through that process. So in the midst of it, before we found out of this, my understanding is that there was an approval, whether they agree it's a final approval from a lender, there were approvals from a lender, and there was even a filing from their attorney in a California court proceeding saying that the loan had been approved. What happened at the end is in 2017, all this income gets written off. There was an issue with a forbearance on a consolidated loan between these two related entities that are the seller, which is in the affidavit of Jim Garrison. So what we were trying to get to was, and the lender issue is a little bit of a red herring. What we were trying to get to, what I was trying to get to, is you have to report on an SBA loan to your lender. You have to provide financials to your lender. You have to apply for a loan. There was an allegation that there was a forbearance entered into, which means that the loan had gone into some type of default. We were attempting to obtain that information so we could see, is what we were given in a financial statement the same that was being provided to the bank? We all know that the best way to test the credibility of a witness or information is to look at what you were given and to look at what they said to someone else. Do they match? Do they not match? Did you file a motion to ask for further time to put that in the record? Yes, I filed a 56D within a week, I think, of being hired. I filed a 56D, and it was never ruled upon and then denied as moot the same day that the judge granted summary judgment. So on June 14th of 18, defendants moved for summary judgment. Early July, I was hired. Within a week, I filed a 56D, and in the 56D, requesting discovery, I requested discovery. I explained how the case had been sidetracked by this attempt to salvage the deal with settlement, which is always a good thing to try to do. Went past the deadline a couple times, right? What went past the deadline, sir? The deadline within which this is supposed to have been executed. Supposed to have closed? Yes. Yes, absolutely did. Absolutely did. So I filed a 56D in July, and I also said, hey, listen, we called it a motion for extension and a 56D. I said, I'm brand-new counsel. I've got to get my feet underneath me and got to learn this case, and it was never ruled upon. I even called the court staff attorneys and bailiffs and said, are we going to get a ruling, or do I have to respond to summary judgment within 10, 11 days of being hired? I had to respond to summary judgment. Let me come back to the issue that Judge Gibbons had raised and Judge Seiler has raised with regards to the financing. Hopefully I artfully put this in my brief. The financing and this loan contingency is a red herring. It's smoke and mirrors. We do not want the property. The property was sold to the city of Greene during the lawsuit. Don't want it. What do you want? Money damages. What money damages are would be attorney's fees and expenditures you had while you were agreeing to delay and not close and so on and so forth. In the end, you didn't want the deal, Correct. But the damages were incurred during the time you were attempting to go forward with the deal. Correct. It is not just attorney's fees. It's consultants and permits and engineering. So you think you've got a deal, and you think the property is this. Hey, this is a good income-producing property. This will be great. They work on their due diligence. I have heard the defendant argue at points and times, it's the sale of land. It doesn't matter what the financial state. It's absolutely false. This was the sale of the business as a going concern. What is your theory of the case? Your theory of the case is that you were induced to continue negotiating the deal because they gave you fraudulent documents at the time you signed the initial agreement. The deal never closed.  Had they given you proper financial information, but they gave you information that was incorrect, and based upon that incorrect information, you continued this lengthy process that generated all these fees until the final point at which you admittedly couldn't close. Absolutely correct. It was the issue of being led down the primrose path. So if we had signed a letter of intent at the beginning, and we got the financials, and it shows that the company is going bankrupt or is in a loan default, we would have never gone down that two years of due diligence. What evidence do we have of that? You say that today you would never have gone down the two-year path, but what evidence do we have on the record, or what evidence were you denied the opportunity to put forward that would help us agree with your position that had you had this information up front, you would have pulled the plug as opposed to thinking, you know, I see there's a problem here with how they're paying the rent, I think, and they weren't paying it, but this still might be a deal we're going to pursue. You're saying what evidence did we have that we would have pulled the plug? Yeah. Again, there were no depositions and there was no discovery. If my clients had been deposed, they would have said that. It's in the affidavits that they filed in support of the briefing up on summary judgment, which is we didn't know all of this, we wouldn't have pursued it, but we were kind of all dealing with that tangential issue of the financing, which was such a one-off, and Judge Adams never really got it. I think he saw an opportunity to use what he considered a condition precedent to kick a complex case, and it wasn't the issue. So let me go to the purchase agreement. Under the purchase agreement, there's all these reps and warranties. Financials have got to be true and accurate. There can't be omissions. Yeah, right. Which are the important ones? Just go to the point. Financial statements must be true and accurate, must be in accordance with generally. . . Which sections of the agreement are you pointing to? Section 4 lays out all of the seller's reps and warranties in Section 5. Don't all those go away if the deal doesn't close? And I'm glad you brought that up. That's exactly where I was going. That's what Judge Adams, how he dealt with it. They do not. In Section 9.3 of the agreement and in Section 5, there is a survival clause, which says if the ademant . . . Does 9.3 relate only to 9.1? Which is the material reps and warranties. I might give you 9.1. The other ones seem to be extinguished through other provisions, I thought. But maybe 9.3 saves the conditions in 9.1. Well, the way I looked at it was that 9.1 encapsulates all the material reps and warranties, and that 9.3 says that that survives. So while the judge looked at it as financing as a condition precedent, we were saying, hey, what comes first, the chicken or the egg? How do you get your financing if you don't have accurate financials and if the financials have been represented and warranted as true and accurate and the state of the business is true and accurate, but it's not? That's a default by the seller that survives the termination. And I never could get him to grasp that. We argued it in the briefing op on summary judgment. We argued it here with the briefing here, which is that that survives and that transcends it. It doesn't matter whether . . . Can I ask you one question before you sit down? Sure. Why did you dismiss your common law claims? The fraud claim? Adam's grant summary judgment on the contract claims. Yeah. And then you voluntarily or with agreement of the other side dismissed the common law claims, right? We felt as if it was going to be they were just going to get railroaded. He basically told me, and I don't mean to use that term lightly, he basically told us you're going to lose and we're going to sanction you, and that was . . . it's like, okay, well, why are we going to pursue the fraud claim when the meat of this claim is the breaches and the reps and warranties that survives the termination, the closing or lack of closing? I don't know what else to do with a federal judge threatening that we're going to lose and get sanctioned. Well, you have appeal rights. Say it again? You have appeal rights and you're here.  Okay. Your time's up. Thank you, Your Honors. Thank you. It is my honor and privilege to appear before you because in all probability this will be the last time I appear before this honorable court after 41 years of practice. However, this case is strikingly similar to a case I argued before this honorable court in 1984, which is a reported case which was Kendall v. The Hoover Company. In that case, I represented The Hoover Company. In this case, I represent John Ranieri individually in Raintree. In that case, the judge granted summary judgment. In this case, the judge granted summary judgment. In that case, plaintiff's lawyer castigated the judge before the court. In this case, you've heard the comments about it. In that case, this honorable court sustained the motion for summary judgment, and I hope the result the same is here today. I want to at the outset apologize to you because had I not agreed to a voluntary dismissal without prejudice, we wouldn't even be here today. And the reason for that was counsel implored me to, look, I'm new counsel, et cetera. Can you help me out and dismiss this without prejudice? Fine. My mistake. I apologize to the court. I apologize to Mr. Ranieri. After 41 years of practice, I continue to make mistakes. But this case is about who's the victim in this case, and that happens to be Mr. Ranieri. We have an 80-year-old man who's been taking care of an invalid wife for over half a dozen years, the last two years bedridden, and God rest her soul, she just – pardon? Is this in the record? It's in the record that he's an 80-year-old man, yes. In any event, what happens is, Your Honor, is that he's got two golf courses, okay? And he sees this knight in shining armor coming along, which is health and wellness. The bank is telling him what to do and what not to do. He's got the two courses. He's got his spouse. So what happens is they sign a letter of intent in July of 2015. Then they sign an agreement, August 24, 2015, two separate purchase agreements. But there are two specific conditions in there. One was a condition of precedent for a written unconditional commitment for financing from a third party. The second was a confidentiality clause. Now, why is that important? Because if you've got a country club and people find out you're going to sell it, then the members leave and you can't get bookings. And that's exactly what happened in this case. While he was being strung along for three years, all of a sudden the membership starts to go and the bookings don't go. And proof positive, Rosemount Country Club just recently closed, and this poor bride has no place to go. And being the father of a recent bride, I can tell you, you certainly wouldn't book a place if you don't know who's going to own it in a year or so. Can I ask you about what I think the case is about, and that's the financial information you provide for the other side? Yes. So none of this would excuse you providing inaccurate financial information? That is absolutely correct, and we did provide it. You provided accurate? Absolutely. So you're quibbling with the threshold point that all the information you provided was accurate? It was accurate, and there's been no proof that it has been inaccurate. In fact, we just had a telephone call in a contemporaneous case because they've sued the accountant down in state court, and the lender said on the record there was no forbearance. There was no lateness, nothing. We were making money, but the bank was dictating what we were doing. I thought the issue was the need for what you called a forbearance, but the payment of between the two entities. Okay, let me get to that immediately then. So that is. And so what happens is, so we've got this agreement, the confidentiality condition proceeding, and they send an accountant for three weeks, more than three weeks, at Raintree and at Presswick. They're going through every little invoice, everything. They've got all the records. So what happens in June? In June, this is Nupur Nugar, who's the attorney, and there's a sister who's a doctor, sends an email to John Ranieri and says, John, I want to call you and Tom and see where we are on the amendments. That's the extensions. I talked with Carolyn today and have the amendments on the tax returns, which show bad debt expense debt forgiveness. That's in June of 2016. This makes it a little difficult. I am hoping the lenders don't come back and say they will offer a lower loan rate. So before the First Amendment, before the Second Amendment, before the Third Amendment, before the Fourth Amendment, they know that there is debt forgiveness. More importantly. You kind of lost me a little bit, maybe. My colleagues are with you. Did Judge Adams say that there was no potentially misleading or untrue information exchanged? Or did he say that whether there was or was not that there was no promise to enforce these were all conditioned precedents related to a closing and the closing didn't happen? I sort of thought he thought maybe there was some fraudulent information or misleading information exchanged but excused it on his reading of the contract. And you're saying there was actually nothing. No. What he did was after we filed our answer and counterclaim, a third-party complaint, Joe Simms, the first attorney, led the court to believe that we were playing hide-the-pea. And he took me over the cold and says, Mr. Kallis, you're going to provide us with all this information. I said, yes, Your Honor. My undergraduate degree is accounting. I have no problem. So we gave them all the information, everything. And the point of the fact is they had the information in 2006 on this debt forgiveness. Here's what it says to her financial lender. She sends an e-mail to her financial lender that says, similarly a forgiveness of debt of about $192,000, which you will see in the Press Club, and this is like the other recognized forgiveness before. So they knew that there was debt forgiveness in 2014, they knew there was debt forgiveness in 2015, and they knew this in June of 2016 before the three amendments. So assuming there was information that was misleading that was exchanged, so there's some support for their theory, do any of their claims survive based upon Section 9.3 of the agreement? Absolutely not. And they didn't argue that down below. On our summary judgment, it wasn't even addressed. So you can't raise for the first time on appeal something you didn't address down in the trial court. So setting aside waivers. Suppose we think they raised it. Even if they did, I think that's their document. It's ironclad. As far as I'm concerned, and it's in black and white, what they say is, and I quote, no claim for breach of any representation or warranty of seller shall be actionable or payable if the breach in question results from or is based on a condition, state of facts, or other matter which was known to the purchaser prior to closing. And it's obvious when you look at Judge Adams' order, I mean, he was relying, I mean, putting aside your adversary's complaint about a lack of discovery, he was relying on an evidentiary record, correct? Correct. But we had given them. Is everything you just told us in that evidentiary record? Yes. And so what you need to understand is he took me over the coals. So he said, Counselor, you're going to provide this information. So this is what we did. January 2nd, we go up and try to get it settled. The very next day, I provide to them the 2017 information for both courses. Remember, at that time, there was only deal for one, Presswick. Raintree was out of the picture. It was only Presswick. And it was supposed to close on May 31, 2017. The next, on June 10th, I gave them the completed financials, 2015 and 16. On June 22nd, I gave them the tax returns, 2015 and 2016, for both courses. On February 22nd, I gave them the accountant's year end for 2017 for both courses. On March 13th, I gave them departmental level breakdowns for both courses. On March 16th, I gave them monthly revenue breakdown for both courses. What were the dates that you provided this information? January, January 2018, February 2018, March 2018. You're saying you're making the point these are in the evidentiary record. Right. And the disclosures were accurately made at an earlier time. Absolutely. And might be inferred. Right. And then we gave them the tax returns. On April 20th, tax day is April 15th, five days. I don't think that's a big delay, but we gave them the tax returns for all three. On May 9th, I gave them the first quarterly report from January to March for both courses of 2018. So they had all this information. I wrote them ten times. Please provide me in writing. And unconditional written commitment. I'm still waiting. I am still waiting for that. So when he signs an affidavit, and he did sign an affidavit to say, and I'm reading from Mr. Stupnicki's affidavit, no discovery has been conducted in this case, not accurate. The plaintiff needs discovery regarding background financials for golf courses, including tax returns, profit and loss statements, bank statements, receivables, and payables. They had all that. You're reading from what? Mr. Stupnicki's affidavit on his 56-D, word for word. If I misstated, you should sanction me. I'm reading it word for word from his 56-D affidavit. So my point is, he could have done all the discovery in the world. It wouldn't have helped him. They knew about it. If the numbers were inflated, you couldn't get a loan. If the numbers were lower, you're sure as heck not going to get a loan. They're the ones that couldn't make their condition perceived. And then coupled with all that, there was discovery. I gave them 6,400 pages of almost 60 pounds worth of material. They gave us 4,500 pages back. There was full discovery. The only thing, and there was written discovery that was exchanged. I've got the written discovery here that was exchanged back and forth from the parties. So we've got the written discovery. I think it's helpful to me, at least, not to say I've got it right here, but to tell me where it might be in the record. In the record. I've got a concrete mind that's got to match up what you're telling me to where it is in the record. So that's more helpful to me than knowing it's in your file. In the record, Your Honor, I don't know if we actually filed the ‑‑ we exchanged it, but I don't know. In federal court. It doesn't help you if it's not in the record. Well, let me see here. I'll have to see if I've got it in the discovery. It was in 2018. The most important thing I have to tell you, Your Honors, is this. If we go back down there, the only entity that's lost any money in this case is Mr. Ranier. He's racked up well over $100,000. The other side spent a lot of money on lawyers and accountants and that kind of thing. They did, but they did it with their eyes wide open. We were strung along. That's really the issue, I guess. Right, it is. To entertain this idea, I suppose. So I think their theory is that you gave them misleading information at the outset and they would have not signed that initial agreement and would not have pursued three years of diligence to potentially close the deal. And I at least read sections 9.1 and 9.3 to potentially create a commitment by your client that survives even the deal not closing. But there's no evidence it was false. Okay, so with respect to that pattern, that theory, one of your arguments is that there's just no falsity. We gave them all the information that's accurate. Are there any other arguments? Are there legal arguments? Is there a legal problem with my articulation of their position? Your Honor, I read— And their theory of damages, assuming there was. I'm not saying that there was. There's a lot on the record to digest, as you've helped us realize this morning. In my opinion, I don't believe those particular clauses survive. I believe that the clause that we cited, the— What clause was that? I think you were reading, but I couldn't tell which clause you were reading. I'm sorry. Let me get it from another— I just—I heard you were reading earlier, but I couldn't tell which. It's the—it's from the judge's opinion. I'm sorry. You also made the point that they didn't preserve this issue. They did not. They did not argue it. It's in the original purchase agreement, and I'll have to get you the particular paragraph. You cited it, though, Your Honor, which says— 9.1 and 9.3 were the two that stood out. 9.1 and 9.3 were the two that stood out to me. But we have your briefs. I don't want to tie up all your— But at the end of the day, they haven't been damaged. At the end of the day, it took them three years to get—assuming all this, they couldn't get the unconditional letter of credit. They couldn't get it, no matter what. What did they present as some kind of a letter of credit? I have that. Do you? Yes. I have it, and it's in the record, Your Honor. And the last—the judge said, finally, you need to give them an unconditional letter by June 5th. On June 4th, this is what I got. They're redacted. I don't know where they're from. I don't know what they are. It's in the record. And one's dated May 29th. The other one's dated May 25th. This is far from an unconditional written commitment from a third-party financial institution. That's as good as it got in May. So if you're going to send it back down, and I hope you don't, we're going to be right back up here again because I strongly feel— and the reason—what I need to tell you is, as soon as we filed the motion— We have one more chance to come back. Well, that could be. But let me say this. We filed our motion for summary judgment on June 19th with opposing counsel. I had numerous conversations with them, and I told them, Joe, you've got nothing here. Please dismiss. June 21, he files a motion to withdraw. When new counsel gets on, I tell them what the lay of the land is, like I've always done in my 41 years of practice. It's, look, you've got nothing here. Please, let's not spend our time and efforts on all this. You don't want the golf courses. The golf courses are doing well. Mr. Ranieri sold Rankery for $3.1 million. He could have gotten half a million dollars more, but he chose to leave it for green space for the City of Green. Presswick was sold for $2.1 million, and the membership is now back up over $300. So it wasn't as if there was anything false here. They just want to get into a business that they don't understand. The golf business is extremely difficult, and they're doing well. And the victim in all this, and I have to say this with all sincerity, was John Ranieri. He was strung along for three years, and he finally got out from under all this. And I strongly believe that Judge Adams got it right, and he would have sanctioned him, and he should have sanctioned opposing counsel for misstatements on no discovery, on I don't have the tax returns, I don't have this, I don't have that. They have them. Thank you. Thank you, Your Honor. Thank you, Judge. Famous last words for a lawyer. I'll try to keep it short and sweet, right? Judge Gibbons brings up a wonderful point when she was talking to Mr. Callis. None of this is in the record. None of this is in the record. There is no order from Judge Adams saying you will produce these tax returns. Wait a minute. Yes, sir. Yes, ma'am. If you look at Judge Adams' order, it is full of citations to affidavits, to declarations. I mean, there was a whether you got the discovery you now claim you wanted, whether you got a scheduling order, which is kind of, I mean, I know the rules now talk in terms of it, but it's kind of beside the point. I don't think it's reversible error. So was your adversary just lying to us about what was in the record? It's not in the record. I don't want to be careful with this. I'm not saying that Mr. Callis didn't give certain things to my predecessor counsel. What I'm saying is that there is no order from Judge Adams. I mean, even if it's not in the record, it would be incorrect as a lawyer for you to make a representation to us that you didn't know certain things if, in fact, they were contained within the materials that had been furnished to your predecessor at a prior time. I mean, we want you to be straight with us about what you do. Absolutely, Your Honor. And we have to decide this based on what was in the record. But, I mean, I sort of feel like I'm not sure I'm getting the straight story from everybody about what happened to me. And let me see if I can clarify that. What I'm saying is that there was no formal discovery of any kind. I got that. Prior to summary judgment. Did they give certain financial records to my predecessor prior to summary judgment? Yes. At what point? It would have been in the spring of 18. Was there an order from Judge Adams ordering them to produce that? No. Was there any lender information from them provided? No. Assume that we don't think it's determinative. Assuming we want to know what information, the point at which you had the information that you claim made you decide not to go forward with the deal. I mean, you've represented that it was very, very, very light in the game. Correct. Your opposing counsel is telling us something different, that it really was two or three years earlier. My clients are telling me that it was the summer of 2017 that they uncovered all of this. In fact, the tax return for 2016 couldn't get filed until the spring of 2017, and that is when all of this came to a head. Into the issue of the lender saying this or the lender saying that, we have never received the information from Huntington Bank. We have never received the information. Quick question. What's the best place on the record that I can find where you preserved the argument regarding sections 9.1 and 9.3 in the district court? Oh, yeah. Thank you. That was something I was going to bring up. They claim that we did not preserve it. That's absolutely false. The 56D is also in our motion for summary judgment in addition to the transcript. It's in the brief and optus summary judgment, our 56D. And as to the issue of the survival clause, page 9 of our brief and optus summary judgment, we stated the issue of whether there was or was not a termination or a condition precedent becomes ultimately immaterial. All of health and wellness' claims for damages survived any alleged termination or any argument made in defendant's motion, and then we cite to that section. 9.3?  Thank you, Your Honor, for your time. We appreciate the argument that both of you have given. We'll consider the case carefully. And at this point, we have a change in